UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JPMORGAN CHASE BANK,           )
NATIONAL ASSOCIATION,          )
AS TRUSTEE,                    )
                               )
            Plaintiff,         )    No. 3:05-0079
                               )    JUDGE ECHOLS
v.                             )
                               )
FIFTH THIRD BANK,              )
NATIONAL ASSOCIATION,          )
                               )
            Defendant.         )

MEMORANDUM

Presently pending before the Court are Defendant's Motion To
Dismiss For Lack of Jurisdiction Pursuant to 28 U.S.C. § 1332
(Docket Entry No. 32), the Motion By Plaintiff JPMorgan Chase Bank,
National Association, as Trustee, For Summary Judgment (Docket
Entry No. 27), the Motion By Defendants Fifth Third Bank and J.
Timothy Street, Successor Trustee[1] For Summary Judgment (Docket
Entry No. 31), and the Motion For Order Of Sale Of Property (Docket
Entry No. 33). The parties have responded in opposition to these
motions.

Plaintiff JPMorgan Chase Bank, National Association, as
Trustee and as successor to JPMorgan Chase Bank as Trustee

---

[1]J. Timothy Street is not a named Defendant in this action.
Because Fifth Third Bank is the only named Defendant, the Court
will treat the summary judgment motion as brought only by that
Defendant.

1

("Chase") brings this diversity action against Fifth Third Bank, successor to Franklin National Bank ("FNB") to determine the priority of four Deeds of Trust executed by Michael E. Redick ("Redick") and recorded against a parcel of residential property in Franklin, Tennessee.

## I. **FACTS**

In January 2002 Redick started a business called Fan-A-Mania Sports, Inc., to sell sports clothing and collectibles in Franklin, Tennessee. He opened the store in May 2002. (Docket Entry No. 29-7, Redick Depo. at 8.) Redick planned to capitalize his business with a private loan from his brother and a business loan from FNB.

In February 2002, Redick opened bank accounts for the business at FNB and submitted his loan application to Jody Eason (formerly Berg). (Id. at 8.) Because Fan-A-Mania was a start-up business, Redick offered his unencumbered home located at 227 Lancelot Lane in Franklin as collateral for a loan. On behalf of FNB, Eason sent Redick a commitment letter dated February 25, 2002, agreeing to extend a working capital line of credit to Redick and his company in the amount of $125,000 with interest-only payments and principal and interest due at maturity. The date of maturity was not specified. (Id., Ex. 2.) Redick could make draws on the line of credit at his discretion with FNB officer approval. Eason and Redick agreed orally that Redick's brother would pay off the short-term note and when it was paid, FNB would extend a line of credit

2

to Redick that would be secured by the same Deed of Trust on Redick's home, as well as the inventory, equipment, furniture, fixtures, and accounts receivable of Fan-A-Mania. (Docket Entry No. 28-7, Eason Depo. at 11-14; Redick Depo. at 12-14.)

In accordance with the agreement, on March 5, 2002, Redick signed individually and as President of Fan-A-Mania a promissory note for $125,000 and a Deed of Trust for Commercial Purposes in favor of FNB as beneficiary, John T. "Pete" Flaugher serving as Trustee. (Docket Entry No. 29-2, Flaugher Depo. at 10, 18.) The Deed of Trust expressly stated that it secured "OBLIGATORY ADVANCES MADE FOR COMMERCIAL PURPOSES[.]" (Docket Entry No. 27-5, Ex. A.)

The Deed of Trust contained a "dragnet" clause, stating as follows:

> TO SECURE TO LENDER: (a) the repayment of the indebtedness evidenced by a promissory note dated 03/05/02, executed by Fan-A-Mania Sports, Inc. in the sum of $125,000, (the "Note") with interest, attorney's fees and costs of collection payable as provided in the Note, which is incorporated herein by reference, together with all modifications or extensions thereto, all renewals thereof, and all replacement notes therefor; (b) the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this Deed of Trust, and the performance of the covenants and agreements of Borrower(s) herein contained (included legal fees); (c) the repayment of any future advances, with interest thereon, made to Borrower(s) by Lender; and (d) the repayment of any and all of Borrower's joint and several guarantees, obligations, existing or hereafter incurred, and whether direct, indirect, or contingent, up to a principal amount of $125,000, plus interest, costs, and attorney fees thereon.

Paragraph 12 of the Deed of Trust was a "Future Advances" clause

3

which stated:

> Upon request of Borrower(s), Lender, prior to release of this Deed of Trust, may make future advances to Borrower(s) (and/or to any persons liable on the Note) up to the original amount of the Note or the maximum amount secured hereby, whichever is greater. Such future advances, with interest thereon, shall be secured by this Deed of Trust unless the parties shall agree otherwise in writing.

(<u>Id.</u> at 3.) Paragraph 23 of the Deed of Trust was an "Obligatory Advances" clause stating:

> As used in this Deed of Trust, the term "Obligatory Advances" shall have the same meaning as used in <u>Tennessee Code Annotated</u> Section 47-28-101 <u>et. seq.</u> The Borrower(s) and the Lender acknowledge that advances under the Note, and any extensions or renewals thereof, are Obligatory Advances.

(<u>Id.</u> at 4.) The Deed of Trust was recorded on March 7, 2002, in the Williamson County Register of Deeds' Office in Book 2402, pages 1006-1010. (<u>Id.</u> at 5.)

Along with the Deed of Trust, Redick also signed on March 5, 2002, as President of Fan-A-Mania, a Commercial Variable Rate Revolving or Draw Note in favor of FNB. (Docket Entry No. 27-5, Ex. B.) The note stated it was a "WORKING CAPITAL LINE OF CREDIT FOR SEASONAL BUSINESS" in the amount of $125,000, and that bank officer approval was required for each draw request. The note provided for interest-only payments beginning April 5, 2002, continuing monthly until final payment of the unpaid principal balance plus accrued interest one year later on March 5, 2003. (<u>Id.</u> at 1.) Redick borrowed the entire $125,000 on the FNB note

4

and used it to purchase inventory for Fan-A-Mania. (Redick Depo. at 15, 27.)

By mid-April, Eason had discussions with Redick to set the terms for additional credit once Redick's brother provided a loan to pay off FNB's $125,000 note. The terms they orally agreed upon included a one-year, interest-only promissory note, secured by FNB's March 5, 2002 Deed of Trust and a lien on inventory, furniture, fixtures, and accounts receivable of Fan-A-Mania. Eason asked Redick to produce certain financial information to support the future line of credit. She did not understand that Redick intended to refinance 227 Lancelot or put other liens on the property. The record does not reveal any written documents confirming that FNB planned to make future advances to Redick and his company or the amount of any such future advances. (Eason Depo. at 14-15, 19-21.)

Redick was not successful in getting a loan from his brother to repay the $125,000 to FNB. He decided to sell his residence at 227 Lancelot for approximately $280,000, move into a smaller house, and use the excess sale proceeds for the business and to repay FNB the outstanding $125,000. He testified he did not tell Eason he planned to refinance 227 Lancelot, yet he intended to retain his open line of credit with FNB. (Redick Depo. at 20-23.)

The sale of 227 Lancelot collapsed on the day of closing because of a dispute between Redick and the buyer. Redick had

5

already signed a contract to buy another home at 202 Golden Leaf Court in Franklin, and he was under the impression he was not obligated to buy 202 Golden Leaf if his sale of 227 Lancelot did not go through. Nonetheless, he relied on the representation of his mortgage broker, Melody Ryan of MetMortgage, that his contract to buy 202 Golden Leaf did not contain a cancellation clause and he would have to buy that property even though he had not sold 227 Lancelot.

Ryan put together a financing package for both 227 Lancelot and 202 Golden Leaf through Franklin Mortgage Funding, Inc. ("Franklin Mortgage"), of Southfield, Michigan.[2] On April 15, 2002, Redick closed at Serenity Title & Escrow LLC on three loans: two secured by 227 Lancelot and one secured by 202 Golden Leaf. (Redick Depo. at 33, 49.) The loan on 202 Golden Leaf is not at issue in this case.[3] (Id. at 16-20, 28-30.)

---

[2]FNB and Franklin Mortgage are not related entities.

[3]Redick later sued Ryan and MetMortgage for misrepresentation. He sought damages from Ryan not only for her alleged misrepresentation, but also for her alleged unauthorized use of credit cards in his name and for damages she allegedly caused to the Golden Leaf property during the period Redick allowed her to live there. (Redick Depo. at 52.)
Redick testified he did not personally sign many of the documents relating to the Franklin Mortgage Deeds of Trust, although his purported signature appeared on the documents; he had never seen an adjustable rate rider or a "Note Allonge" attached to the note bearing his alleged signature; and a provision requiring a pre-payment penalty was apparently typed on the note after he signed and initialed it. (Docket Entry No. 29-9, Redick Depo. Ex. 1 at 2; Exs. 9, 11.) Ryan told him specifically the note did not include a pre-payment penalty, and he would not have taken the loan if he had known it included a pre-payment penalty because he wanted

6

Concerning the Lancelot property, Redick signed two adjustable rate promissory notes and two Deeds of Trust in favor of Franklin Mortgage. The two notes represented an 80/20 financing of 227 Lancelot. (Docket Entry No. 28-4, Parker Depo. at 15.) The first note was made in the amount of $218,400, and was secured by a Deed of Trust recorded in the Williamson County Register of Deeds' Office on April 22, 2002, in Book 2436, pages 528-546. (Docket Entry No. 1, Complaint, Ex. B.) The second note was made in the amount of $54,600, and was secured by another Deed of Trust, recorded on April 22, 2002, in Book 2436, pages 547-561. (Id. Ex. C.) The Deed of Trust securing the $218,400 loan was assigned to Plaintiff Chase, and the loan was sent to its servicing company, Homecomings Financial Network, Inc., on June 1, 2002. (Docket Entry No. 30-7, Spangler Depo. at 11, Ex. 4.) The Deed of Trust securing the $54,600 loan was assigned to Popular Financial Services LLC.[4] (Id. at 6-8, Ex. 2.)

Kimberly Parker of Serenity Title served as closing agent for Franklin Mortgage. She was asked to close Redick's loans at the last minute with a few hours notice because Redick's situation changed from a sell/purchase to a refinance. (Parker Depo. at 12.)

---

to sell the real property quickly for cash to invest in his business. (Redick Depo. at 31-40, 42-48, 54-55.)

[4]Since Chase is not the current holder of the second Deed of Trust, the parties agree that Chase cannot pursue any interest in that Deed of Trust.

7

The title search showed the only lien against 227 Lancelot was a $125,000 first Deed of Trust to FNB. Franklin Mortgage instructed her to satisfy the $125,000 and obtain a release of the Deed of Trust to place Franklin Mortgage in first lien position on 227 Lancelot. (Id. at 12; Ex. A.)

Parker reviewed FNB's Deed of Trust, which she knew secured obligatory advances made for commercial purposes. (Id. at 47-49.) This caught her attention because she knew different closing procedures should be used in satisfying a line of credit. She called FNB's payoff department and spoke with Beth Hobbs, who verbally informed Parker that the payoff amount for FNB's note was $125,998.06 in principal and accrued interest. Parker asked Hobbs if FNB's loan secured a line of credit and Hobbs responded, "No." Based on the verbal payoff amount and the representation that the Deed of Trust did not secure a line of credit, Parker closed Redick's loans with Franklin Mortgage on April 15. She expected to receive FNB's written payoff statement within the borrower's three-day contract rescission period after closing and before funds were disbursed. (Id. at 12-14, Ex. J.)

The next morning, April 16, FNB faxed to Parker a written payoff statement showing the same amount of principal and interest due that Parker had been told verbally the previous day. The form included a box that could be checked if FNB's loan was a line of

credit. The box was not checked.[5] (Id. at 23.) Based on the written payoff statement, Parker continued to believe that FNB's loan to Redick had not been made pursuant to a line of credit and that, upon disbursing funds in the amount of $125,998.06, FNB would release its Deed of Trust on 227 Lancelot, placing Franklin Mortgage in first lien position. Based on this information, Serenity Title disbursed to FNB three days later a check in the amount of $125,998.06, stapled to a copy of FNB's written payoff statement. (Parker Depo. at 19-21, 25; Docket Entry No. 27-5, Ex. E.) Redick thought the $125,998.06 paid by Franklin Mortgage to FNB was to repay the line of credit, and he believed the line of credit at FNB would continue to exist after the repayment. (Redick Depo. at 71, 83.)

Serenity Title notified Franklin Mortgage it held first lien position on 227 Lancelot through a "first lien letter," but Parker denied that it was customary for Serenity Title to issue such letters, she denied that she issued the letter, and she denied that the signature on the document was hers. She believed someone who worked at Serenity Title signed her name to a Franklin Mortgage

---

[5]John Flaugher, an FNB officer, testified the failure to check the box could have been error, but the "clerk[s] giving these payoff letters a lot of times don't know" whether the loan for which payoff information is requested is a line of credit. (Flaugher Depo. at 9.) Moreover, clerks in FNB's payoff department do not have authority to tell anyone asking for payoff information on a loan whether or not the deed of trust will be released. (Id. 74.) In fact, a loan officer may release a deed of trust only with his prior approval. (Id. at 75.) He did not receive a request to release the March 5, 2002 Deed of Trust. (Id. at 76.)

9

"first lien letter" when the file was shipped. (Parker Depo. at 18-19, 35-36, 50.)

FNB cashed the check from Serenity Title, but it did not release its Deed of Trust on 227 Lancelot.[6] FNB has "held deeds of trust unreleased for lines of credit, even though [FNB was] paid off on a particular note." (Flaugher Depo. at 11.) FNB would not release its Deed of Trust because it secured obligatory and future advances. (Id. at 15.) FNB's payoff department failed to notify the loan officer, Eason, in accordance with the bank's ordinary practice, that Redick's loan had been paid by Serenity Title. (Eason Depo. at 46-47.)

Redick again turned to FNB seeking additional loan funds. Eason testified she thought Redick had paid off the $125,000 note with the proceeds of a loan from his brother, as previously agreed. (Eason Depo. at 9.) In a May 10, 2002 Lending Officer's Report, she documented that FNB would advance $50,000 to Fan-A-Mania, and the collateral for the loan would be $113,160 in inventory and $22,000 in equipment. She listed a loan-to-value ratio of thirty-seven percent (37%) as justification for making the loan, meaning

---

[6]It was not until more than one year later, on August 26, 2003, that Parker received an inquiry from Stewart Title Guaranty Company about why FNB's lien had not been released. Chase had made a claim on the title policy issued by Stewart Title. (Parker Depo. Ex. B.) Parker called FNB's payoff department and was told the file had been closed out and was archived, but it could be retrieved. Parker again asked if the Deed of Trust secured a line of credit. She was again told it did not. (Parker Depo. Ex. J.) She next heard from FNB's attorney, who told her a release would not be provided. (Id. at 29-30.)

10

that the $50,000 loan amount was 37% of the aggregate value of the inventory and equipment. (Id. at 22.) Eason also checked a box next to "Borrower's residence," when identifying security for the loan, but then she scribbled over her "X." She testified she "wasn't sure what to do because [she] knew he had the lien on the property and [she] didn't know if [she] should "X" [the box] or not." (Eason Depo. at 21-22, Ex. 5.)

Thus, contrary to her earlier deposition testimony, Eason appeared to concede that she knew Redick financed 227 Lancelot and that Franklin Mortgage had placed a lien on it. Moreover, there is other evidence from which it can be inferred that Eason and Redick discussed the financing of the real property before FNB advanced $50,000 on May 24, 2002, and that Eason knew about Franklin Mortgage's lien on 227 Lancelot. On May 20, Redick faxed to Eason the financial inventory form she requested to support FNB's line of credit. In the fax cover sheet, Redick told Eason: "The second house should close in the next two weeks and that will come off the inventory. The proceeds from that sale will be going into the store." (Eason Depo. Ex. 4.)

On May 24, 2002, while Eason was out of town, Redick received the $50,000 advance from FNB. Eason's assistant handled the matter. Eason's lending limit at the time was $75,000, although she expected Redick's line of credit to increase to $100,000. (Id.) Redick signed another Commercial Variable Rate Revolving

11

Draw Note and an Unlimited Continuing Guaranty. (Redick Depo. Exs. 5 & 6.) The terms of the note were similar to the March 5, 2002 note, with interest-only payments commencing June 24, 2002, and continuing monthly, with all unpaid principal and interest due on May 24, 2003. Both Eason and Redick claimed that FNB advanced the $50,000 secured by the March 5, 2002 Deed of Trust on 227 Lancelot and a security interest in Fan-A-Mania's inventory, equipment, furniture, fixtures and accounts receivable. (Eason Depo. at 13-14; Redick Depo. at 22.)

On August 6, 2002, Eason completed another Bank Lending Officer's Report in preparing to advance $100,000 to Fan-A-Mania. (Eason Depo. Ex. 8.) FNB rolled into the advance the $50,000 FNB loaned on May 24, 2002. (Eason Depo. at 10.) In the report, Eason identified the collateral as $216,985 in inventory and equipment, although she believed FNB's March 5, 2002 Deed of Trust was still a first lien on the property and she felt FNB was fully protected. (Id. at 31.) Nonetheless she spoke to her supervisor, who in turn spoke to John Flaugher. They decided to add a second Deed of Trust on Redick's residence "as an abundance of caution" to secure the additional loans that had been advanced. (Eason Depo. at 32-33, Exs. 3, 8; Flaugher Depo. at 71.) Both Eason and Flaugher initialed a file note about the second Deed of Trust. (Eason Depo. at 31.)

Attorney David McMackin handled the August 19 closing. FNB's

instructions, prepared by Eason, stated the loan amount would be $100,000 and requested a second position Deed of Trust for "obligatory advances (business line of credit) on 227 Lancelot and a title insurance policy." (Flaugher Depo. at 92-93, Ex. 24.) The instructions also stated, "We are taking a blanket UCC on Inventory & Equipment[.]" (Id.)

A title search prepared for McMackin by an independent contractor revealed FNB's March 5, 2002 Deed of Trust as a first lien on 227 Lancelot and Franklin Mortgage's two mortgages as second and third liens. McMackin received the title search on August 8, and he believed he discussed it with Eason "a few days after that," but he could not recall when he spoke with her. (McMackin Depo. at 25-26.) He advised her he was concerned that Franklin Mortgage had two deeds of trust and not one. He told her FNB's $100,000 loan would be behind those deeds of trust. He did not know if Eason knew about the two Franklin Mortgage deeds of trust. "She acted like that was the first time she heard of that[.]" (Id. at 26.)

McMackin conceded he erroneously thought FNB and Franklin Mortgage were the same entity, and he may have assumed he was preparing documents for a refinancing because he could not recall having a conversation with anyone at FNB before the closing. (Id. at 10.) In the margin of the title search form next to FNB's first lien March 5, 2002 Deed of Trust, McMackin wrote, "Paid, to be

13

released, prepare release." (Docket Entry No. 28-2, McMackin Depo. at 8-9, Ex. B.) In the margin next to Franklin Mortgage's $218,400 Deed of Trust, McMackin wrote, "1st mtg show as exception[.]" (Id. at 9, Ex. B.) The commitment he sent to FNB's loan department for review prior to closing required release of FNB's March 5, 2002 Deed of Trust. No one from FNB told him that was incorrect. (Id. at 22.)

On August 19, 2002, FNB advanced $100,000 to Fan-A-Mania. The Deed of Trust executed by Redick and recorded in the Register of Deeds' Office at Book 2544, pages 801-805 stated the property was encumbered for the current year's real estate taxes and "a first mortgage" to Franklin Mortgage in the principal sum of $218,400. (Eason Depo. Ex. 9.) The title insurance policy excepted from coverage Franklin Mortgage's first and second Deeds of Trust. (Eason Depo. at 36 & Ex. 9, Schedule B.)

Eason recalled she learned of the two mortgages in favor of Franklin Mortgage after FNB's August 19 closing. According to her, McMackin notified FNB's loan department that Franklin Mortgage's two Deeds of Trust were in first and second position and that FNB's August 19, 2002 Deed of Trust was in third position, not second, as his closing instructions had directed. (Eason Depo. at 15, 28, Ex. 7.) Eason's supervisor, Jim Wells, relayed the information to her. She then spoke with McMackin, who asked her if FNB was paying off one of the other liens against 227 Lancelot because he thought they

14

were prior loans made by FNB. She replied she did not "even know that there were other liens on there. The client didn't even tell me that he had a mortgage on it." (Eason Depo. at 29-30.)

Eason called Redick in the latter part of August 2002. According to her, she learned for the first time that Redick had been unable to obtain a loan from his brother and had mortgaged 227 Lancelot in part to repay the $125,000 to FNB. (Id. at 30.) Wells returned the loan package to Eason, and she changed her report to show the collateral for the $100,000 loan was inventory and equipment and a third Deed of Trust on 227 Lancelot. (Eason Depo. at 30, 34, 41, Ex. 8.) Eason instructed FNB's loan department not to release the security interest in Fan-A-Mania's inventory and equipment. (Eason Depo. at 23 & Ex. 6; Flaugher Depo. at 89.)

Eason's intent was that FNB would at all times have the first priority lien against 227 Lancelot and that is why the March 5, 2005 Deed of Trust was not released. (Id. at 41, 43, 45.) By August 2003, the indebtedness to FNB totaled $98,488.80. (Flaugher Depo. at 22.)

Redick testified the May and August transactions with FNB were simply continuations of his first transaction with FNB in March 2002, and it was his intent that FNB would have a first Deed of Trust on 227 Lancelot. (Redick Depo. at 20, 55-56.) He also testified, however, that he intended for FNB to have a first lien on 227 Lancelot until it was sold. (Id. at 21.)

15

FNB personnel noticed Redick's going-out-of-business sale at Fan-A-Mania and learned that Redick had sold merchandise to his brother, Richard. FNB sued Richard Redick and recouped sale proceeds in the amount of $33,473.37. (Docket Entry No. 32-3, Flaugher Aff. at ¶ 8.) FNB also repossessed and liquidated the remaining inventory and equipment of Fan-A-Mania. In the end, approximately $50,000 remained on the debt to FNB. (Flaugher Depo. at 19, 21, 79-80.) Redick, a/k/a Fan-A-Mania Sports, Inc., filed a Chapter 7 bankruptcy petition on July 15, 2003. (Redick Depo. Ex. 19.) FNB obtained emergency relief from the automatic stay to proceed on its March 5, 2002 Deed of Trust.

Chase then filed a civil action against FNB in the Chancery Court for the Twenty-First Judicial District on September 10, 2003. Chase filed two summary judgment motions, which the court denied. The matter was set for trial on March 8, 2005, by Agreed Order entered on December 4, 2004. On January 31, 2005, Chase filed a Notice and Order of Voluntary Dismissal in Chancery Court and filed this diversity action the same day. The Chancery Court awarded FNB more than $25,000 in attorney's fees.

Chase's expert witness in this litigation is Frank Alvstad, Middle Tennessee District Manager for Stewart Title Guaranty Company, which issued the title insurance policy insuring the priority of Franklin Mortgage's Deeds of Trust. (Docket Entry No. 30-2, Alvstad Depo., Ex. 17, Alvstad Aff. at ¶ 9.) In Alvstad's

opinion, Kimberly Parker of Serenity Title paid off FNB's March 5, 2002 Deed of Trust in a customary and appropriate manner for a mortgage not securing a line of credit, and FNB had a duty to release the Deed of Trust within forty-five days of receiving written notice to release, pursuant to Tenn. Code Ann. § 66-25-102. (Alvstad Depo. at 20-21, 24-25.)

Alvstad admits that Franklin Mortgage, Serenity Title and Stewart Title were all on notice that FNB's Deed of Trust secured obligatory advances and future advances for commercial purposes. (Id. at 42.) Moreover, it is not Stewart Title's policy to close loans on verbal payoff information. The accepted practice for obtaining a satisfaction and release when sending payoff funds is to send a payoff and close out letter with demand for release. Another practice widely used by the vast majority of closing agents, however, is to send the payoff check with a copy of the payoff statement, with the expectation of obtaining a release after disbursing the funds, as Parker did here. (Id. at 23, 31, 46, 59.)

When asked if such a procedure applies to a deed of trust for commercial purposes involving future advances and obligatory advances, Alvstad replied, "Probably not." (Id. at 65.) If a prior mortgage involves a line of credit, proper procedure is to obtain either an unconditional payoff or, if conditional, to escrow the maximum amount of the debt until a check can be exchanged for a release. (Id. at 33, 45, 47.) This would include obtaining a

17

signed letter from the borrower stating the line of credit should be closed before sending payoff funds to the prior lender. (Id. at 57.) Parker was familiar with this procedure and knew she would have to follow it if a line of credit were involved. (Parker Depo. at 24.) Stewart Title bears the risk if a written release is not procured because the unreleased mortgage is a cloud on the title. (Alvstad Depo. at 36, 62.)

FNB's expert, attorney Larry N. Westbrook, attests that Parker did not follow the normal and customary standards of the industry or the policies and procedures mandated in a closing involving the payoff of a deed of trust for commercial purposes. (Docket Entry No. 44, Westbrook Aff. at ¶¶ 6-10.) Specifically, Parker did not obtain a written payoff prior to closing, she did not send a cover letter with the payoff check advising FNB to release its Deed of Trust within forty-five (45) days, she did not tender a written demand for release prior to or after closing, and she did not conduct a follow-up title search to be sure the release was recorded in the Register of Deeds' Office. Had she sent a letter with the payoff check advising FNB to release its Deed of Trust, FNB would have received the notice before making another advance to Redick on May 24, 2002. (Id. at ¶ 7.) Further, Franklin Mortgage was obligated to disburse funds on April 15, the day of Redick's closing, even though Redick, as borrower, had three days to rescind the transaction. Thus, receipt of FNB's written payoff statement

18

after closing could not have provided Parker any grounds to stop funding of the loans, as she testified she would have done, if FNB's written payoff statement had contained information inconsistent with its prior verbal payoff statement. (<u>Id.</u> at ¶¶ 12-15.)

## II.  <u>STANDARD OF REVIEW</u>

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Covington v. Knox County School Sys.</u>, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. <u>See</u> <u>Martin v. Kelley</u>, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. <u>See</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986); <u>Covington</u>, 205 F.3d at 914 (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of

material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. <u>Celotex</u>, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

### III.  <u>ANALYSIS</u>

**A.  Motion to Dismiss for Lack of Jurisdiction**

Defendant FNB moves to dismiss the Complaint for lack of diversity jurisdiction on the ground that the amount in controversy is less than $75,000. FNB contends its balance due from Fan-A-Mania Sports as of July 27, 2005, is $57,708.71, exclusive of any court costs and attorney's fees. (Flaugher Aff. at ¶ 10.) Because interest has been accruing, the balance was less when Chase filed this action in January 2005. FNB contends its attorney's fee claim in state court should not be considered in determining the amount in controversy in this federal action, and in any event, the state court awarded FNB $25,972.50 in attorney's fees in the state case, (Docket Entry No. 35-1, Ex. 1, Order), and thus, attorney's fees are not presently in controversy.

Chase asserts that the aggregate amount secured under FNB's

March 2002 Deed of Trust exceeded $75,000 and FNB's attorney's fee claim should be included in determining the present amount in controversy. Also, FNB made an offer of judgment, including attorney's fees, that exceeded $75,000. (Docket Entry No. 36-2, Ex. A.) Additionally Chase claims that two of FNB's affirmative defenses--that Chase is not the mortgage assignee and that the mortgage is void because of fraudulent actions by Melody Ryan and MetMortgage--increase the amount in controversy to well over $218,000.

A federal district court has original diversity jurisdiction if the suit is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of costs and interest. 28 U.S.C. 1332(a). <u>Rogers v. Wal-Mart Stores, Inc.</u>, 230 F.3d 868, 871 (6th Cir. 2000). "[T]he amount alleged in the complaint will suffice unless it appears to a legal certainty that the plaintiff in good faith cannot claim the jurisdictional amount." <u>Klepper v. First American Bank</u>, 916 F.2d 337, 340 (6th Cir. 1990) (citing <u>St. Paul Mercury Indem. Co. v. Red Cab Co.</u>, 303 U.S. 283, 288-89 (1938)). The Court must examine the Complaint at the time it is filed. <u>See</u> <u>id.</u>

In the Complaint, Chase challenges the priority of FNB's $125,000 mortgage as compared to its $218,400 mortgage. These amounts are exclusive of interest, costs, and attorney's fees. Moreover, at the pleading stage, Chase would not necessarily know

the balance Redick owed on his debt to FNB. Chase seeks a declaratory judgment holding that its $218,400 mortgage is superior in right to FNB's Deed of Trust. Thus, FNB's view that the only amount in controversy is the $57,708.71 outstanding on its mortgage is too restrictive.

It does not appear to a legal certainty that Chase in good faith cannot claim the jurisdictional amount. Thus, the Court finds that more than $75,000 is in controversy and that the Court has original diversity jurisdiction. See Klepper, 916 F.2d at 340. Because the Complaint establishes diversity jurisdiction, the Court need not decide whether FNB's attorney's fee claim, now resolved in state court, should be considered in determining the amount in controversy. Defendant's Motion to Dismiss for Lack of Jurisdiction Pursuant to 28 U.S.C. § 1332 will be DENIED.

## B. Priority of the mortgages

Tennessee statute permits a commercial lender to secure future advances as follows:

> A mortgage may provide that it secures not only existing indebtedness or advances made contemporaneously with the execution thereof, but also future advances, whether obligatory, or optional, or both, and whether made under open-end credit agreements or otherwise, to the same extent as if such future advances were made contemporaneously with the execution of the mortgage, even though no advance is made at the time of the execution of the mortgage and even though no indebtedness is outstanding at the time any advance is made.

Tenn. Code Ann. § 47-28-102. An "obligatory advance" is defined as an advance which the creditor is required to make by

22

agreement with the borrower, whether or not a subsequent event beyond the control of the creditor may allow the creditor to cancel the obligation to make such advance. Advances shall be deemed obligatory, even though made pursuant to a credit agreement or mortgage containing some or all of the following provisions:

* * *

(C) Requirements for procedures to be followed by the borrower to activate the obligation to make advances[.]

Tenn. Code Ann. § 47-28-101(6). An "optional" advance is "any advance which is not obligatory." Tenn. Code Ann. § 47-28-101(9).

FNB's recorded March 5, 2002 Deed of Trust extended a line of credit for future advances to Redick for commercial purposes under these statutes.[7] FNB and Redick agreed, and intended, in both the dragnet clause and in paragraph 23 of the Deed of Trust that all advances made by FNB were "obligatory advances" under the statutes cited above. See Wright v. Lincoln County Bank, 465 S.W.2d 877, 881 (Tenn.Ct. App. 1970) ("We must consider the intention of the parties to the deed of trust to be what the plain language therein declared it to be.") A dragnet clause must be enforced on its terms if its language is plain and unambiguous. Home Fed. Bank, FSB v. First Nat'l Bank, 110 S.W.3d 433, 437 (Tenn. Ct. App. 2002); Johnson v. Midland Bank & Trust Co., 715 S.W.2d 607, 611 (Tenn. Ct. App. 1986).

---

[7]Because FNB's Deed of Trust secured future advances for commercial purposes, this case does not involve an "open-end credit agreement" which is defined as "a revolving credit agreement that is secured by a mortgage and that is not entered into for commercial purposes." Tenn. Code Ann. § 47-28-101(7). An "open-end mortgage" secures an "open-end credit agreement." Tenn. Code Ann. § 47-28-101(8).

23

Thus, contrary to Chase's argument otherwise, the Court concludes FNB's March 2002 Deed of Trust secured obligatory, not optional, advances.

Under Tenn. Code Ann. § 47-28-101(6), FNB could, and did, require Redick to pay off the first $125,000 advance before FNB made a second advance of $50,000 in May 2002. FNB could, and did, rely on the March 2002 Deed of Trust to secure the May 2002 advance because § 47-28-102 states a commercial mortgage can be used to secure future advances "even though no indebtedness is outstanding at the time any advance is made." When FNB made the second $50,000 advance in May 2002, Redick had no outstanding indebtedness to FNB, yet the March 5, 2002 Deed of Trust had not been released and secured the $50,000 advance. Likewise, under statute, FNB could advance $100,000 to Redick in August 2002, and still be secured by the March 2002 Deed of Trust.

Chase claims, however that its intervening April 15, 2002 mortgage on 227 Lancelot takes priority over FNB's March 2, 2002 Deed of Trust. First, Chase contends that FNB's mortgage was extinguished as a matter of law when Serenity Title sent FNB a check for $125,998.06, stapled to a copy of FNB's written payoff statement in accordance with common practice among real estate closing agents. Chase relies on Tenn. Code Ann. § 66-25-101(a), which provides:

> When a debt secured by a mortgage, deed of trust, or by lien retained in a deed of conveyance of land or bill of sale, or other instrument, has been fully paid or satisfied, the mortgagee, transferee, or assignee of the

24

> mortgagee or the legal holder of the debt secured by deed of trust or lien, who has received payment or satisfaction of the debt, must satisfy the record by a formal deed of release.

If a release of a deed of trust is not provided within forty-five (45) days after receipt of a written demand to release, § 66-25-102 provides that certain penalties apply. Chase also cites Tenn. Code Ann. § 47-28-110(2), for the proposition that no provision of the chapter pertaining to commercial mortgages securing future advances shall be construed to "[d]eny or curtail the right to a release of lien where the obligation it secures has been fully paid or satisfied[.]"

To read §§ 66-25-101(a) and 47-28-110(2) as Chase would have the Court read them would eviscerate § 47-28-102, which expressly permits an commercial lender to rely on a deed of trust to secure future advances, "even though no indebtedness is outstanding at the time any advance is made." Moreover, Kimberly Parker conceded that, prior to closing Franklin Mortgage's loans for Redick, she reviewed FNB's Deed of Trust for commercial purposes and it raised a question in her mind whether a line of credit was involved. As previously stated, FNB's Deed of Trust clearly provided that it secured a commercial line of credit for future obligatory advances from the bank to Redick. Parker knew that if FNB's Deed of Trust secured a line of credit, she needed to follow additional procedures to obtain full satisfaction and release of FNB's Deed of Trust, including obtaining a written statement from Redick agreeing to close the line

25

of credit.

It is undisputed that Beth Hobbs in FNB's payoff department gave Parker incorrect information when she stated the Deed of Trust did not secure a line of credit. However, the evidence is also undisputed that Parker violated Stewart Title policy when she closed Franklin Mortgage's loan to Redick on verbal payoff information from FNB. Additionally, there is no indication she checked with Redick to determine the status of his line of credit with FNB. Redick testified he wanted to keep the line of credit open, and had Parker asked, Redick likely would have told her not to close the line of credit. Parker would have realized she could not deliver first priority status to Franklin Mortgage as instructed.

Further, Parker did not make a written demand on FNB to release its mortgage pursuant to §§ 66-25-101 and 66-25-102. Chase's own expert admitted that the loan closing procedures followed by Parker did not apply to FNB's Deed of Trust securing obligatory future advances and that FNB was under no obligation to release its March 2002 Deed of Trust immediately upon receipt of payoff in mid-April 2002 because Serenity Title had not made a written demand for release. (Alvstad Depo. at 26-27.)

The case of Commerce Fed. Savs. Bank v. FDIC, 872 F.2d 1240 (6th Cir. 1989), cited by Chase, does not control here. In that case, the dragnet provision in the deed of trust "expressly provided that the deed of trust would be extinguished if all outstanding debt

26

encumbering the instrument were timely retired." <u>Id.</u> at 1242. Here, FNB's March 2002 Deed of Trust did not include similar language stating the lien would be extinguished upon payment of all outstanding debt.

Chase next contends that FNB had actual notice of its intervening mortgage and therefore, FNB's Deed of Trust securing the May and August *optional* advances lost first lien priority under § 47-28-103(c). The Court has already concluded that FNB's March 2002 Deed of Trust secured *obligatory* advances that were made in March, May and August. All such obligatory advances "relate back to the time of the recording of the mortgage, and are prior and superior to subsequent encumbrances and conveyances[.]" Tenn. Code Ann. § 47-28-103(a)(2).

Actual notice of an intervening encumbrance becomes relevant only if obligatory advances are "made pursuant to an optional increase in the credit limit of a revolving credit agreement that is not an open-end credit agreement" or if optional advances are made under a mortgage securing future advances. Tenn. Code Ann. § 47-28-103(b) & (c). FNB did not make an optional increase in Redick's line of credit when it made the May $50,000 loan. Redick had paid off a $125,000 line of credit. The evidence shows his agreement with Eason to continue and renew the same line of credit, secured by the March 2002 Deed of Trust, was made in mid-April 2002, before Redick closed on the Franklin Mortgage loans. Additionally,

27

FNB's advances to Redick were obligatory, not optional, as memorialized in the express language of the March 2002 Deed of Trust. Cf. Home Fed. Bank, FSB, 110 S.W.3d at 439-440 (discussing actual notice because case involved optional, not obligatory, advances).

Thus, even if FNB had actual notice of the intervening mortgages--through Redick's conversations with Eason, Serenity Title's contact with the FNB payoff department, closing attorney McMackin's title search for the August 2002 closing, or McMackin's contact with FNB's loan department prior to the August 2002 closing-the result does not change. FNB's March 2002 Deed of Trust secured obligatory future advances and was prior and superior to the April 2002 Chase mortgage. Consequently, FNB is not liable to Chase in damages for failure to release its lien, and FNB is not liable to Chase on a claim of libel of title. See Ezell v. Graves, 807 S.W.2d 700 (Tenn. Ct. App. 1990).

The Court will grant Defendant FNB's Motion for Summary Judgment and deny Plaintiff Chase's Motion for Summary Judgment. The Court will also deny Chase's Motion for Order of Sale of Property (Docket Entry No. 33). In the event the Court did not grant its motion for summary judgment, Chase asked the Court to order a sale of 227 Lancelot on Chase's mortgage free and clear of FNB's Deed of Trust, with payment of the proceeds into the registry of the Clerk pending further proceedings. Because the Court will

grant Plaintiff's motion for summary judgment and there will be no further proceedings in this Court, there is no need for the Court to order sale of the property and direct payment of the proceeds into the registry of the Court. FNB may proceed on the terms of its March 2002 Deed of Trust in conformance with applicable Tennessee law.

### IV. CONCLUSION

For all of the reasons stated, Defendant's Motion To Dismiss For Lack of Jurisdiction Pursuant to 28 U.S.C. § 1332 (Docket Entry No. 32) will be DENIED. The Motion By Plaintiff JP Morgan Chase Bank, National Association, as Trustee, For Summary Judgment (Docket Entry No. 27), will be DENIED. The Motion By Defendants Fifth Third Bank and J. Timothy Street, Successor Trustee For Summary Judgment (Docket Entry No. 31), will be GRANTED. The Motion For Order Of Sale Of Property (Docket Entry No. 33), will be DENIED. The case will be DISMISSED WITH PREJUDICE.

An appropriate Order shall be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

29